We will hear argument next in No. 23-1019, Roku v. Universal Electronics. Good morning, Your Honors, and may it please the Court. This appeal centers on a single dispositive claim construction issue, is to the meaning of the phrase, data that functions to identify. Now that's a non-technical term that has broad meaning, meaning that the data must be used to facilitate the function of identifying without regard to whether additional processing is performed on the data or whether other information is also used. One of the things that I guess I found rather scarce in the briefing is references to sources, whether it's case law from this context or others, about a phrase functions to. For example, this would come up in 1.12.6 context. I'm not sure whether we would say in that context that something performs a function if it really enables it. In fact, I think we have said not. And your word facilitate is rather close to this enable idea. Yes, Your Honor. So we didn't cite any extrinsic evidence, such as dictionary definitions or the like, for the plain meaning that the phrase functions to. And as far as we could tell, this Court has not construed that phrase in other cases. To answer Your Honor's questions about Section 112, that's a slightly different context in which we're determining whether a claim term has sufficient disclosure for a function in the specification. But here we're talking about HDMI functionality. And the claim is expressly recited, expressly recites and is directed to that functionality. But just so I understand, your position right at its core is that when the DVD sends out or sends the word pause to describe its current state, that functions to identify something other than pause, namely play or some controllable function that many users would want to exercise next when they have that state. That's exactly right, Your Honor. That's what the prior chart in reference discloses. And if we think about it, that makes sense because the home theater device, which is the entity that is controlling the appliance, can't know about how to control the appliance unless it knows how the appliance is currently being controlled. And that's what the specification of the 486 patent discloses, Your Honor. Do you think that's one environment in the specification? I do, Your Honor. The passage from column 14 through column 15 is a single continuous embodiment. That embodiment is describing at appendix 63, column 14, line 30, it is describing icon metadata or icon information. And everybody agrees, the board included, that icon metadata is a type of data that functions to identify. And then at appendix 64, column 15, line 45, the patent says that icon metadata can convey the appliance's, quote, current status. And that is exactly what the prior chart in discloses, Your Honor. And that's significant. Can I ask you another question before you move on? Yes, Your Honor. I wanted to ask you, is your argument that the board improperly read in something like functions to directly identify or functions alone to identify, those kinds of words? Yes, Your Honor. Not only did the board read out the phrase functions to, which is a broad phrase, the board read in the word itself. And in our view, the board's construction means that the data has to itself communicate. And alone. Alone. Indirectly. Indirectly. It's an extraordinarily narrow interpretation, Your Honor. I believe the only way to satisfy that interpretation would be if the appliance tells the home theater device, my controllable function is X. And as I was saying in the beginning, that's inconsistent with. Also, I would emphasize that it says a controllable function, right? That's exactly right. It doesn't say the controllable function or a specific controllable function. I don't even know how you would say it. But it does say a controllable function. Well, that's correct, Your Honor. Any controllable function. And as long as the DVD player says that I am in a pause state, the TV uses that information to infer that a controllable function is play. It doesn't have to be the only controllable function. And if we think about it, this has to be the case because the claim is directed to HDMI functionality. And under standard HDMI protocol, the home theater device is the entity that determines appliance capabilities using the claimed data. UEI itself has conceded that point both before this court at page 38 of its red brief, as well as before the board at appendix 165 and 245. And that's a key concession. Because if the home theater device identifies the controllable function using the claimed data, then there is no reason for the claimed data to itself communicate the claim, the controllable appliance. That context supports our construction, Your Honors, and the board ignored it. Those embodiments, though, that would be captured under the board's narrow construction would also still be within the scope of the claims under your broader construction. That's exactly right, Your Honor. Our construction encompasses and is broader than UEI's narrower construction that the board adopted. And I think that goes to show why the board's reading of the specification cannot be correct. Because the board noted that our, or I'm sorry, that the specification doesn't preclude UEI's construction, and that there's support for both parties' construction, constructions, and yet the board used that to determine that there's ambiguity in the specification. But I would submit, Your Honor, if the specification is broad enough to support both parties' constructions, then it supports the broader construction. Or stated differently, if the specification doesn't preclude our construction, it necessarily precludes the board's construction. What about an argument that isn't it kind of odd to have the claim say data, for example, saying pause would function to identify a different function than the data, than the function that the data is actually identifying? Does that make sense? Yes, Your Honor, I think I understand. Especially causing you to identify play, as opposed to pause identifying pause. I understand the question, Your Honor. And I don't think there's anything inconsistent or awkward with that conclusion. I think a message can expressly identify content, and in so doing, function to identify other content. And I think it has to be that way, because the home theater device will take as input the status data, and will use that input to determine, perhaps by looking at a lookup table or some algorithm, that the output that is the controllable function while in that pause state is play. So I don't see the inconsistency in that, Your Honor. I will note that UEI's expert also conceded during his deposition that Claim 9 of the 486 patent covers that very embodiment where an appliance conveys that it is in a pause state, and in so doing, the home theater device determines that the controllable function is play. Just getting back to the language, I guess, following up on what Judge Stoll was saying, you're reading the phrase receiving at the home theater device data that functions to identify a controllable function to mean the same as receiving at the home theater device data that the home theater device uses to identify a controllable function. That's correct, Your Honor. I guess it seems to me that the difference between those two is in who or what is doing the identifying. I think that's an accurate description, Your Honor. And I'll note again that UEI acknowledged in its brief at page 38 that the home theater device has identified the controllable function in that receiving step. Again, they acknowledged that before the board at Appendix 165 and 245. And that goes to Your Honor's point. If the home theater device is the entity that is identifying the controllable function using the claim data, there is no reason for the data to itself have to expressly and directly identify the controllable function. I just did want to get back briefly to the point that UEI's own expert admitted at Appendix 3139 during his deposition that Claim 9 covers that Chardon embodiment that we've been discussing. And if Claim 9 covers Chardon, then Claim 1 must as well. The board erred by considering... One of the mysteries for me, speaking personally in this case, is what Claim 9 means. I have no idea how to explain it. Yes, Your Honor. So Claim 9 specifies that the controllable function is a media rendering function that is provided via use of the appliance. And UEI... What does via use of the appliance mean? Well, it... I'm adding on. You haven't answered the question, but that's the word that closes it. Sure. Yes, Your Honor. We read that to mean that the controllable function depends on how the appliance is currently being used. UEI itself has conceded that point in its red brief, I believe, at page 36. Yes. The provided via use of the controllable appliance language could indicate that the controllable function simply exists as a result of the current state of the controllable appliance. I agree with that reading, Your Honor. And if that's true, then the data that functions to identify the controllable function must be broad enough to somehow account for the current state of the appliance. And that's exactly our argument. That's exactly what we see in the specification in Column 15. And that's exactly what UEI's expert has testified is covered by the claim. To date, UEI has never tried to reconcile its expert's testimony with the Board's construction. UEI says you're not arguing that the prosecution history supports your construction. Is that correct? I would say that is correct with one tiny caveat. And that is at Appendix 864 in the prosecution history, the applicants don't use the phrase data that functions to identify. They use a broader phrase, data indicative of. I think that choice of words actually does support our construction because data indicative of is broader than the Board's very narrow construction. Aside from that caveat, I would agree with Your Honor. So mostly the prosecution history is relevant to you explaining why it doesn't support their construction as opposed to actually helping us. That's correct, Your Honor. I mean, clearly there is a dispute between the parties as to whether the Board relied on a disclaimer theory without finding that the heightened standard applies. For the reasons set forth in our briefing, I think that's exactly what the Board did. And UEI doesn't have a good response. I mean, you're right, there's disclaimer. But there's also just relying on the prosecution history in order to be able to understand the meaning of a claim term. That's correct. You've got a separate argument on that point. That's correct. That's exactly correct, Your Honor. We're not saying that the file history cannot be considered. It should be considered as intrinsic evidence. But the probative value of the file history depends on the clarity of the claims, the specification, and the file history. Here, the file history is muddled. The applicant's remarks at Appendix 864 comprise a single paragraph that spans the entire page. The Board itself noted that the applicant intermingled multiple bases for distinguishing the prior. And as I noted to Judge Stark, the applicant didn't even use the claim phrase at issue here. So even if this Court disagrees that we're in a world where the only way the file history can narrow the scope of the claims is through disclaimer, I think the probative value of the file history is just very weak in this case, given how muddled and ambiguous it is. And emphasizing in particular, I think that Sakai was distinguished primarily because there was a separate server that provided the information, identifying the information, identifying the controllable function. Is that right? Or it didn't come from a home theater? Yes. Your Honor is exactly correct. At Appendix 864, the applicant was distinguishing Sakai State data not based on the nature of the data itself, but which device within Sakai's architecture uses the data. The claims require the home theater device to use the data to add an icon to the user interface. But in Sakai, the server unit doesn't do that. It forwards the data onto a different device, the remote control, which then adds the icon to the user interface. That is the distinction that the applicant seems to be making at Appendix 864, as best as I can tell. Even to the extent that the applicant were distinguishing Sakai State data based on the nature of the data itself, that's different from Chardon State data because, as we noted in our briefing, Sakai State data refers to the state of a menu on the television. That is, if you can navigate a menu on the television by clicking up, down, or left, or right, then the up, down, or left, right buttons will appear on the remote control. In that sense, Sakai uses State data. That's completely different from Chardon State data, and UEI has never addressed that. The board says at 821 in the claim construction that the patent owner's position on claim construction is supported by Dr. Turnbull's testimony. Does that mean we need to reach the extrinsic evidence and review it deferentially? No, Your Honor, I don't think so. I believe that's the only place in the entire analysis where the board even cited, or maybe one of two places where the board cited the expert testimony. And even there, there's no fact finding to which this court could give deference under Teva or Knowles. And this expert testimony merely pertains to how the expert would read the intrinsic record, not as to the meaning of the term in the art or any extrinsic source of evidence. I would submit that to the extent any extrinsic evidence is probative, it's UEI's expert's deposition testimony that I noted earlier where he acknowledges that the Claim 9 does cover Chardon. Thank you. Thank you, Your Honors. We will restore some of the time. Thank you.  May it please the Court. The board's construction of the data that functions to identify limitation was correct, whether you look at the plain language of the claims, whether you look at the specifications, and whether you look at the prosecution history, which wasn't correct. If you look at the plain language of the claims, Your Honor mentioned the words functions to. It says what the data does, what the purpose of it is. It identifies a controllable function of a controllable appliance. Now, if you look at the claim language, it's very important that this data comes from the controllable appliance itself. It's in the receiving step, the first step, receiving at the home theater device from a controllable appliance, et cetera, data that functions to identify. So the board looked at that language, and then citing Phillips, appendix page 19 of the board's decision, it says, well, the claims themselves provide substantial guidance as to the meaning of particular terms, so let's look at the rest of the claim. So they looked at the other two steps, the automatically adding step and the causing step, and both of those steps have the following language, the controllable function of the controllable appliance that was identified by the data received from the controllable appliance. And the board concluded, okay, the antecedent basis for that is the claim element at issue from the receiving step. So that must mean that the data itself identifies the controllable function of the controllable appliance. I don't understand where the data itself comes in. How is the automatically step or the causing step indicating a narrower meaning to data that identify or functions to identify? I just don't see what precludes the broader understanding that the appellant is arguing for. Because it's not, because it's the data, it says the data that identifies the controllable function, not some other data, not, if you look at Roku's construction, they want to read it to mean data that can be used in connection with other information. Well, the claims don't say that. I guess that's a better way to ask the question. Why couldn't these later steps be performed if at the receiving step it was the data from the controllable appliance plus from some other source? Well, some other data, and I'll show you in the specification, Your Honor, exactly where. Some other data could come into play in the subsequent steps, but not in the receiving steps. If you look at the figure that the parties had all this debate about during the IPR, figure 15, the specification. I do want to get to the specification, but you're starting appropriately with the claim language. Yes. I've missed the logical step in the board's writing, and I'm missing it as you're articulating it now, how it is you're seeing the automatically adding and the causing step are somehow supporting the narrow construction at the receiving step. Well, it supports it for two reasons. One, based on the language that was identified by the data received from the controllable appliance, those words are in the automatically adding and causing step. The antecedent basis for that is the claim element at issue in the receiving step. It's saying the data, the data itself received from the controllable appliance is what identifies the controllable function, not some other information. What about it doesn't say that data alone identifies, and it doesn't say that data directly identifies? It doesn't say that. So I agree with you that it removes that functions to identify, right? I mean, that's the most work it does. But even so, if it removes functions to, still the phrase data that identifies a controllable function is flawed. How do you respond to that? The way I respond to it, Your Honor, is that I don't believe it is broad, especially when you look at the specification, which is part of the intrinsic record, which informs the claim language. It's not broad. If Your Honors will permit me, let's look at figure 15. Can I ask one more language question? The board, well, maybe Roku's position would be the same even without the term function. If the claim simply said data that identifies a controllable function, that, too, would permit use of other information based on that data to identify the controllable function. Did Roku ever concede that even if the words functions to were not there, that the analysis would be any different? They did not. But, Your Honor, it's important. If I may be remembering right, I don't know whether you were at the board. I was not. I think in the transcript of the board, the APJ asked that question, and I didn't quite remember what the answer was. Because if that were correct, then any disparity in usage between the receiving step and the adding and causing steps would disappear. Each one of them would permit the home theater appliance and device to do the identifying based on the data. Well, the home theater device doesn't do the identifying. The claim language says receiving at the home theater device from a controllable appliance in communication with the home theater device via use of HDMI connection, data that functions to identify. So that data comes from the controllable appliance, and that's important. Because it was those amendments to the causing and automatically adding steps during prosecution that helped the board reach the conclusion that the data itself that comes from the controllable appliance has to do the task, and not in combination with some other data. And the specification supports that. Okay. Okay. So there's a nice reproduction of it on appendix page five of the board's decision. And if you look at the top, you have reference numerals 1502, 1504, 1506, 1508. And let's stop there for a moment. And 1508 says icon metadata available from the appliance. That's a query. That's a question. Now, the parties agreed below that the term icon metadata or icon information, as the written description calls it, is an example of the data that functions to identify in the claims. So it wants to know at step 1508, is this identifying data available from the appliance? If it is, it goes directly down to where it says send to the smart device. That's the only part of this figure that asks the question, does the data that identifies the controllable function come from the appliance as the claims require? Roku wants to rely on another part of this figure where the answer to that question at 1508 is no. So if the data cannot and does not come from the controllable appliance, what happens? It goes through this other route until it gets to 1518 where it says obtain icon metadata for the appliance, not from the appliance. And then what happens? This icon metadata is retrieved from an external server 207.  It comes from a database that has information about older devices. So what Claim 1 covers is the situation where the query is made and data that identifies a controllable function comes from the controllable appliance itself. And the board in its decision noted those words as being important because during prosecution, the causing and the automatically adding steps were amended to clearly point out that the data that identifies must come from the controllable appliance. And if you look at the figure, it seemed to me like through this flow, you can you can practice Claim 1 using data in addition to data coming from the appliance, which is exactly what would be captured additionally by their construction. But his rule is is not captured by your narrower construction. So what am I missing? But Your Honor, the claim requires that the data that does the identifying, that identifies the controllable function, must come from the controllable appliance. You say it must. It must alone. But I don't see how this figure helps you get there. Because that, as we call it in our brief, that branch of it that goes to the right to 1508. 1508 asks the question, is there icon data, icon metadata? What evidence do we have that you don't look at the other branch in understanding this claim language? Because the other branch, the evidence that we have that shows that you don't look at the other branches because there's nothing in the other branch where icon information or icon metadata comes from the appliance itself. It doesn't. It says at 1518, it says obtain icon metadata for the appliance, which is stored in some external database which is not the controllable appliance. And if you look at the specific citations to the specification that Roku relies on, and if we go to appendix page 63, column 14, beginning at line 35, with the words, if the icon information is available, meaning if the data that identifies the controllable function is available, what happens next? And it says the icon information may be sent to the smart device by the appliance and or retrieved by the smart device using other information provided by the appliance as appropriate. That's what they're relying on, the words other information. But the identification of the controllable function has happened already because it says icon information. You're talking about transferring that information somewhere else. You can use other data to do that. So you read that as excluding a situation where other information is used in addition to the information coming from the appliance. Sure, because there is nothing in this specification and in the cited portions of it that Roku relies on that says if the icon information is coming from the controllable appliance, which is what the claim is, other information can be used with that to identify the controllable function. It doesn't say that in the specification. But it doesn't say you can't do that. Would you acknowledge that? There's no embodiment of it that says you can do that. I want to address, in the two minutes I have, this issue about claim nine and Roku's expert supposedly conceding something. And I think the page of the appendix that's important here is counsel cited A31, 38, and 39. And so the expert, UI's expert, is being asked about claim nine. And when he's talking about claim nine, your honors can read it as well as I can. I'm sorry, what page are we at? Yes, sir, it's appendix page 3138 over to 3139. Here's the question and continues on to 3139. So when we get there, UI's expert is talking about what this, they're not talking about the data that identifies limitation. He's talking about what could this media rendering function be. He's not talking about what is encompassed by the data that functions to identify limitation. And in addition, Roku has argued that claim nine covers state data. But during prosecution, the patentee did distinguish the Sakai reference based on its use of state data, and because this state data did not come from the controllable appliance. He distinguished it on two grounds. So if that position is claim nine covers state data, that's really far afield of what we're talking about here, because not only did the patentee distinguish prior art based on state data, when the board took the claim construction and analyzed the references cited by Roku, they said, well, here, look, the HDMI 1.3a prior art, it has state data. That can't identify a controllable function. So the prosecution history is important. And if I can point in my... Could I just ask you before you do, 3133, you're an expert, Dr. Turnbull. It seems to me like he's agreeing that the identification doesn't have to be done just from a controllable device. The question at line 15, so data that functions to identify a controllable function of the controllable device has to describe the icon itself that's going to be added to the user interface? Answer from your expert, no. It just needs to be able to help identify that or identify that icon. Is that a problem? I don't think it's a problem at all, Your Honor, and I'll tell you why. It's because the question asked about the icon. The icon comes in in the next step. But the icon, I thought you already told us, is agreed in connection with figure 15 at least, to be an example of the claim term that we're talking about. The icon information, the parties agreed, is an example of the data that functions to identify. What he's asking about here is the way the question was framed, it's what you do to automatically add the icon to the user interface. Look at the top. This is the question they left out, page 76, lines 4 to 7. Question, right? So on its face, the data has to identify a controllable function of the controllable appliance, correct? And he says yes. But it doesn't have, what I'm driving at is it doesn't have to specifically identify or describe the icon itself. Answer, I think it has to be associated with the icon. Well, the specification would certainly not enable an embodiment that covers Roku's claim construction because the entirety of column 14 and 15 of the written description and figure 15 show that the only time that data that identifies a controllable function is used in the claims comes from the controllable device, from the controllable appliance, not from some remote server. It just doesn't. And I know I'm over my time, but I just want to point, Your Honors, to the prosecution history, that one part of the prosecution history that counsel was talking about. It's appendix page 864. And yes, this is a long paragraph, but one of the things that the patentee argued at the bottom was in short, it is respectfully submitted that the state data that is used in the system of Sakai is not and would not be considered by one of skill in the art to be the claim data indicative of a controllable function of a controllable appliance. So if their position, which it appears to be in the brief, is that claim 9 covers state data, the patentee said it doesn't in the prosecution history, and the board said state data cannot identify a controllable function. Thank you. Thank you very much. Thank you, Your Honor. I'll try to keep this brief. Judge Stark, I agree with your reading of their expert deposition testimony. He did concede that claim 9 covers the embodiment that Chardon discloses, that is, Chardon's state data. Even to the extent that the applicant distinguished Sakai's state data during the file history, as I've explained and as we set forth in our briefing, that is different. It is fundamentally different from Chardon's state data, and my colleague on the other side has not addressed that distinction. With regard to the file history, I think to the extent that we can glean anything from the file history, it's that the phrase data that functions to identify was already in the claims when the claims were rejected as anticipated. And if the applicant truly had intended to narrow the scope of that term to cover data that itself identified, it could have done so expressly, and that's not what it did. It added other claim language to other limitations, and I think the board's conclusion that the applicant intended to narrow the disputed phrase by adding language to other phrases simply is incorrect. I also heard from my colleague on the other side that the home theater device is not the entity that identifies the controllable function. That's wrong. Again, we've pointed out in their briefing at page 38, as well as in the record below, they conceded that it is indeed the home theater device that identifies the controllable function using the claimed data. Can I come back to one language point? Yes, please. I think in our earlier discussion you said that you are, in fact, reading the receiving clause to mean the same thing as a rewritten clause connection data that the home theater device uses to identify. And if it means that, then isn't there some tension, I think as the board was suggesting, between the different phrases and the automatically adding and causing, because there it says this function was identified by the data, not by the home theater device using the data. No, Your Honor. I don't think there is tension because those downstream limitations, of course, refer back up to the antecedent limitation. And they cannot and do not change the nature of the data itself or what it conveys. Rather, they merely clarify that the controllable function was identified in the antecedent step, however it was identified. And the board simply overread those downstream limitations to suggest that they somehow narrow the scope of the antecedent limitation. That's inconsistent with basic antecedent basis law. But to Your Honor's point about whether we would be in a different situation if the claim had read data that identifies, I think the answer would be no. And I think that's what we said below at the oral hearing, as Your Honor noted. Data that identifies is still sufficiently broad. It doesn't preclude data that is used to identify. But even setting that aside, the claim language that actually appears is unambiguously broader than data that identifies. And the board's construction is unambiguously narrower. I could say a word about the specification. I see my time is up, but I'm happy to answer questions if there are any. Thank you, Your Honor. Thank you.